Affirmed in Part and Reversed and Remanded in Part and Opinion filed
January 27, 2009








 

Affirmed
in Part and Reversed and Remanded in Part and Opinion filed January 27, 2009.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-07-01060-CV

____________

 

DAN TURNER AND HENRY BONAPARTE, Appellants

 

V.

 

TROY PERRY, Appellee

 



 

On Appeal from the 215th
District Court

Harris County, Texas

Trial Court Cause No. 2006-02596

 



 

O P I N I O N








In this accelerated interlocutory appeal, police officers
Dan Turner and Henry Bonaparte challenge the trial court=s denial of their
assertions of qualified and official immunity.  Appellee Troy Perry sued
appellants, his former supervisors, alleging that they took adverse employment
actions against him and slandered him in retaliation for his official complaint
accusing them of unlawful conduct.  Appellants contend that (a) they acted
in response to unprotected speech, (b) their employer=s grievance
process provided Perry with adequate due process, and (c) their representations
of Perry=s conduct were
made in good faith.  We reverse the trial court=s denial of
summary judgment based on qualified immunity to one of Perry=s First Amendment
claims, affirm the trial court=s ruling in all other respects, and remand
for further proceedings.

I.  Factual and Procedural Background

Alief Independent School District (AAISD@) employed
appellee Troy Perry as a APeace Officer-Gang Enforcement Officer@ in 2004. 
Sergeant Henry Bonaparte was Perry=s direct
supervisor, and Captain Dan Turner was the captain of the AISD police
department.  As a police officer responsible for investigating gang-related
activity, Perry interviewed students and obtained and evaluated documents
containing gang-related information.  According to Plaintiff=s Seventh Amended
Petition, Perry completed an application in July 2004 to submit AISD=s Agang database@ to the Department
of Public Safety (ADPS@); however, Turner
did not sign the application, and the appellants did not allow Perry to release
the information to DPS. 

In April 2005, information Perry had learned through his
work as a gang officer caused him concern that there would be an increased risk
of gang-related violence at several AISD schools on May 5 and May 16, 2005.  He
communicated the information he had gathered to gang investigators of several
police agencies and the office of the Texas Attorney General.  On April 21 and
22, 2005, he emailed the information to Turner, Bonaparte, and other law
enforcement agencies and personnel.  According to Perry, DPS employee Vicki
Norris contacted him and asked if he would allow her to post this information
to a website on his behalf.  The website, referred to in the record as ACLEO,@ is a
password-protected site accessible to criminal-justice personnel.  To obtain
access, an officer must complete a written application, which must also be
signed by the officer=s supervisor.  Perry had completed an
application, but because appellants refused to sign it, he could not access
CLEO directly.  Perry therefore authorized Norris to post the information for
him.  








After the information was published on the CLEO website,
Bonaparte emailed Perry that Athe [AISD] superintendent=s office had been
inundated with calls for information in reference to the warning you had posted
on the CLEO web site.@  On May 4, 2005, Bonaparte again emailed
Perry, stating, AFrom this point on no information[]
regarding activities in and around this district will be given out without
prior written approval from [a] departmental supervisor.  Your decision to
export data is causing a number of problems; this directive includes both
written and verbal communications.@  In addition,
Perry was demoted from his position as a gang officer to a position as a patrol
officer and placed on a Agrowth plan@ on July 15,
2005.  According to Perry, both Turner and Bonaparte informed him that these
disciplinary measures were, in part, a response to the CLEO posting.  Perry
filed a grievance concerning that action, and in an undated memorandum,
Bonaparte summarized the discussion that occurred during Perry=s grievance
hearing on September 13, 2005.  According to Bonaparte, Perry contended that he
was reassigned from his position as a gang officer to a position as a patrol
officer as a Adirect result of his disclosure of a gang[-]related
issue via a national web site.@  Bonaparte further stated that APerry did not
perform in a satisfactory fashion during his tenure as a gang officer and he
will not be returned to the position.@  He  concluded
that APerry has had
problems with following the chain of command and has disseminated information
to other outlets without supervisory approval.@








While these events were unfolding, Perry allegedly learned
that Bonaparte and Turner had entered Perry=s office while he
was away and removed a traffic citation he had written concerning an AISD
teacher.  According to Perry, Bonaparte told him that the citation was removed
because the teacher was Apolitically connected.@  On July 20,
2005, Perry asked the advice of an acquaintance at the Harris Count District
Attorney=s Police Integrity
Unit, and he was told that he should collect evidence of the alleged
misconduct.  Perry then obtained still photographs from a surveillance tape
that reportedly shows Bonaparte and Turner entering Perry=s office and
leaving with a piece of paper.  On or about October 18, 2005, Perry lodged an
official complaint with an assistant district attorney in which he alleged that
Bonaparte and Turner had unlawfully tampered with a government record. 
According to Perry, an assistant district attorney told him that the cited
teacher said Turner had assured her that he would Atake care of@ the citation. 

On October 27, 2005, Perry filed a complaint with the
school district in which he alleged that appellants had retaliated against him
for reporting their conduct to the district attorney=s office.  In
connection with this grievance, Perry also related that he arrested a female
student at Elsik High School on September 21, 2005, and at Turner=s instruction,
transported the student to the AISD police station for processing.  At the
station, Perry telephoned an assistant district attorney who accepted Perry=s charge that the
student resisted arrest.  Perry also intended to arrest the student for ADisorderly Conduct
B Abusive Language,@ but he was notified
by the police dispatcher that Turner had ordered him to leave the student in
the custody of Officer Wayne Cox and return to Elsik High School.  While he was
away, Cox issued the student a citation for ADisruption of
Class@ and released
her.  In a subsequent letter to Bonaparte, Perry stated that he advised the
assistant district attorney that Cox had erroneously released the student, and
the attorney advised Perry to complete the charges and process the arrest at a
later date.  Perry also complained about the release to Turner, who allegedly
responded that he, Turner, had been Aordered to issue
all students who were arrested at Elsik citations and release them.@  Perry asserts
that he completed an offense report on the day of these events regarding the
charges against the student, and appellants expressed no objection to the
report at that time.  








The charges against the Elsik High School student were
entered into the Juvenile Offender Tracking system on September 29, 2005,[1]
and Perry attempted unsuccessfully to apprehend the student on the same day. 
When he returned to the station, he was given a letter of reprimand, dated
September 28, 2005, in which Turner stated that Perry violated AISD=s procedural
requirement that all officers notify an AISD police supervisor of an alleged
criminal offense before contacting the Harris County District Attorney=s office to
institute charges.  The letter continued, AYou are notified
by receipt of this memorandum that you are required to contact an AISD Police
Supervisor prior to contacting any ADA for charges.@  Perry concluded
that the reprimand, Aarbitrarily enforcing an unwritten
practice,@ was issued to retaliate against him for reporting
Bonaparte and Turner to the Harris County District Attorney=s office for
illegal conduct.

Perry filed further grievances on October 11, November 2,
and November 11, 2005.  After he filed the November 11th grievance, AISD=s Director of
Human Relations, Rose Benitez, summoned Perry to her office.  In a meeting
between Benitez, Perry, and Bonaparte, AISD terminated Perry=s employment.  On
November 17, 2005, Benitez wrote to Perry and stated that, at her November 11th
meeting with him, they discussed issues concerning Perry=s job performance,
including his  A[i]nappropriate interaction with students.@  Benitez further
stated that a copy of the letter would be placed in Perry=s personnel file.[2]


On January 12, 2006, Perry sued Turner, Bonaparte, and
AISD.  He alleged that AISD terminated his employment in retaliation against
him for reporting violations of law by Turner and Bonaparte.  He asserted
claims against Turner and Bonaparte in their individual capacities for slander
and intentional infliction of emotional distress.  In addition, he alleged that
they took adverse employment actions against him in violation of his rights
under the First and Fourteenth Amendments. 








Turner and Bonaparte moved for partial traditional summary
judgment on the grounds that they are protected from suit by qualified immunity
and official immunity, and Perry failed to exhaust administrative remedies. 
The trial court denied the motion on November 26, 2007, and this accelerated
interlocutory appeal timely ensued.

II.  Issues
Presented

In their first issue, Turner and Bonaparte contend the
trial court erred in denying their summary-judgment motion asserting qualified
immunity to Perry=s claims that they violated his
constitutional rights to freedom of speech and due process.  In their second
issue, appellants contest the trial court=s failure to grant
summary judgment based on appellants= assertions of
official immunity to Perry=s claims of slander.[3]


III.  Standard of Review

To succeed in a motion for traditional summary judgment
under Texas Rule of Civil Procedure 166a(c), the movant must establish that
there is no genuine issue of material fact and the movant is entitled to
judgment as a matter of law.  W. Invs., Inc. v. Urena, 162 S.W.3d 547,
550 (Tex. 2005) (citing Lear Siegler, Inc. v. Perez, 819 S.W.2d 470, 471
(Tex. 1991)).  In reviewing a summary judgment, we consider the evidence in the
light most favorable to the non‑movant and resolve any doubts in the non‑movant=s favor.  Id. (citing
Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548B49 (Tex. 1985)). 

IV.  Analysis

A.      Qualified
Immunity








 Qualified immunity protects governmental officials
performing discretionary functions from suit if their actions were objectively
reasonable in the light of then clearly-established law.  Anderson v.
Creighton, 483 U.S. 635, 638, 107 S. Ct. 3034, 3038, 97 L. Ed. 2d 523
(1987).  Stated differently, the question of whether an official may be held
personally liable for an allegedly unlawful official action is determined by
examining the objective legal reasonableness of the action in light of the laws
that were clearly established at that time.  Id. at 639, 107 S. Ct. at
3038 (citing Harlow v. Fitzgerald, 457 U.S. 800, 818B19, 102 S. Ct.
2727, 2738B39, 73 L. Ed. 2d 396 (1982)).  Because the official=s actions are
measured against a standard of objective legal reasonableness, the official=s subjective
belief that his conduct was lawful is irrelevant to the analysis.  Id.
at 641, 107 S. Ct. at 3040.

In analyzing whether qualified immunity applies, we first determine
if the facts, taken in the light most favorable to the party asserting injury,
showed that the official=s conduct violated a constitutional
right.  See Scott v. Harris, 550 U.S. 372, B, 127 S. Ct. 1769,
1774B75, 167 L. Ed. 2d
686 (2007) (noting that, when reviewing ruling on an official=s motion for
summary judgment claiming qualified immunity, the court usually adopts the
plaintiff=s version of the facts).  If the facts as alleged
constitute such a violation, we consider whether the right was clearly
established in light of the specific context of the case.  Id. 127 S.
Ct. at 1774; Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034,
3039, 97 L. Ed. 2d 523 (1987).  The right was Aclearly
established@ if the contours of the law at the time of the conduct
at issue gave fair warning that such conduct would violate the employee=s constitutional
rights.  See Hope v. Pelzer, 536 U.S. 730,
741, 122 S. Ct. 2508, 2516, 153 L. Ed. 2d 666 (2002) (citing United States
v. Lanier, 520 U.S. 259, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997)); Saucier
v. Katz,  533 U.S. 194, 202, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272
(2001) (AThe relevant, dispositive
inquiry in determining whether a right is clearly established is whether it
would be clear to a reasonable officer that his conduct was unlawful in the
situation he confronted.@); Eastland County Coop. Dispatch v.
Poyner, 64 S.W.3d 182, 195B96 (Tex. App.CEastland 2001,
pet. denied) (applying Saucier).  

1.       Claims
Arising from Alleged Violations of Perry=s First Amendment
Rights








Since 1968, courts have followed the Pickering balancing
test to determine if the speech of a public employee is protected by the First
Amendment.  Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will
County, Ill., 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed.2d 811 (1968).   To
apply the Pickering test in determining whether a public employer
unconstitutionally penalized an employee for engaging in protected speech, we
balance (a) the interest of the employee, as a citizen, in commenting upon
matters of public concern, and (b) the interest of the governmental
agency, as an employer, in promoting the efficiency of the public services it
performs.  Id. at 568, 88 S.Ct., at 1734B35.  In analyzing
the constitutionality of the employer=s actions, Acourts look to the
facts as the employer reasonably found them to be.@  Waters v.
Churchill, 511 U.S. 661, 677B78, 114 S. Ct.
1878, 1889,  128 L. Ed. 2d 686 (1994) (plurality op.).[4] 
Whether an employee=s speech addresses a matter of public
concern is determined by the content, form, and context of a given statement,
as revealed by the whole record.  Connick v. Myers, 461 U.S. 138, 103 S.
Ct. 1684, 75 L. Ed. 2d 708 (1983).

In Connick, the Court discussed several facts on
which it relied in analyzing whether speech Atouched upon a
matter of public concern.@  Id. at 149, 103 S. Ct. at 1691. 
These factors included: 

$                  
whether the
speech was merely an extension of an employment dispute;[5]

$                  
whether the
speech was focused on Agather[ing] ammunition for another
round of controversy@ with the employee=s superiors;[6]









$                  
whether the
speech occurred at work or on the speaker=s own time and outside of the working areas of the office;[7]


$                  
whether the
speech impeded the ability of the speaker or other employees to perform their
duties;[8]

$                  
whether the
employee sought to inform the public that the employer Awas not discharging its
governmental responsibilities in the investigation and prosecution of criminal
cases@;[9]
and

$                  
whether
the employee A[sought] to bring to light actual or potential
wrongdoing or breach of public trust@ on the part of
superiors.[10]


Although
these factors are not a general standard against which statements must be
judged, they illustrate the application of the Acontent-form-context@ test required by Pickering. 
See id. at 147, 103 S. Ct. at 1690.








In 2006, the United States Supreme Court decided Garcetti
v. Ceballos, in which it further refined the First Amendment balancing test
applicable to governmental employees.  547 U.S. 410, 126 S. Ct. 1951, 164 L.
Ed. 2d 689 (2006).  As the Fifth Circuit Court of Appeals explained, Garcetti
Aadded a threshold
layer@ to the Pickering/Connick
analysis.  Davis v. McKinney, 518 F. 3d 304, 312 (5th Cir. 2008).[11] 
In Garcetti, a supervising district attorney was disciplined after
writing a memorandum that his employer considered inflammatory.  Garcetti,
547 U.S. at 420B23, 126 S. Ct. at 1959B61.  The Court
explained that the employee wrote the memorandum Aas a prosecutor
fulfilling a responsibility to advise his supervisor about how best to proceed
with a pending case.@  Id. at 421, 126 S. Ct. at 1960. 
Significantly, the Court held that, as a threshold matter, employees are not
speaking as citizens for First Amendment purposes when they speak Apursuant to their
official duties.@  Id.  Thus, under Garcetti,
the reviewing court must shift its initial focus Afrom the content
of the speech to the role the speaker occupied when he said it.@  Williams v. Dallas Indep. Sch. Dist., 480 F. 3d 689, 692 (5th Cir. 2007)
(per curiam).  

In sum, the inquiry regarding whether a governmental
employee=s speech is
constitutionally protected now involves three considerations.  First, we must
determine whether the employee=s speech was made pursuant to his or her
official duties.  Davis, 518 F.3d at 312.[12] 
If so, then the speech is not protected by the First Amendment, because A[r]estricting
speech that owes its existence to a public employee=s professional
responsibilities does not infringe any liberties the employee might have
enjoyed as a private citizen.@  Garcetti, 547 U.S. at 421B22, 126 S. Ct. at
1960.  Second, if the speaker did not engage in the speech pursuant to official
duties, then we must determine whether the speech touched upon a matter of
public concern.  Davis, 518 F.3d at 312.  Third, if the speech does
pertain to a matter of public concern, we apply the Pickering/Connick test
to balance the employee=s interest in expressing his concerns with
the governmental employer=s interest in performing its services
efficiently.  Id.








Subsequent cases have further clarified Garcetti=s effect on the Pickering/Connick
test.  For example, in Nixon v. City of Houston, the Fifth Circuit Court
of Appeals considered a police officer=s statements to
the media criticizing, among other things, his employer=s high-speed
pursuit policy.  511 F.3d 494, 496B97 (5th Cir.
2007).  Some of the statements were made at an accident scene while the officer
was in uniform and on duty; others appeared in magazine articles written by the
officer.  Id.  In the articles, the officer also Acharacterized
inner‑city minority residents as >rats,= women with cats
as mentally unstable, homeless people as >criminals,= and children with
problems as >freaks.=@ Id. at 500
n.9.

On appeal, the court held that the statements at the
accident scene were made pursuant to the officer=s employment
responsibilities, and thus, were not subject to First Amendment protection.  Id.
at 498.  As the court explained, Athe fact that [the
police officer] performed his job incorrectly, in an unauthorized manner, or in
contravention of the wishes of his superiors does not convert his statement . .
. into protected citizen speech.@  Id. at
498B99.  Although the
court did not determine whether the officer acted pursuant to his professional
duties in writing the magazine articles, it held that the articles were
unprotected under the Pickering test in any event because they brought A>the mission of the
[police department] and the professionalism of its officers into serious
disrepute,=@ thereby undermining citizen confidence in
the department and impairing  the performance of its functions.  Id. at
500B01 (quoting City
of San Diego v. Roe, 543 U.S. 77, 81, 125 S. Ct. 521, 524, 160 L. Ed. 2d
410 (2004)).[13] 
In reaching this conclusion, the court emphasized that it was Amindful of the
paramilitary structure of the police department and the greater latitude given
their decisions regarding discipline and personnel regulations.@  Id. at
501.

a.       Causing
Gang-Related Information to be Posted on CLEO








In their first issue, appellants contend that the trial
court erred in denying their motion for qualified immunity to Perry=s claims arising
from his release of gang-related information for posting to the CLEO website. 
According to Perry, this speech was protected by the First Amendment, and thus,
appellants violated his constitutional rights by subjecting him to employment discipline
for engaging in this speech.  Appellants assert that this speech is not
protected under Garcetti because it relates to Perry=s employment.  We
agree.

Although the parties have not identified the statement in the
record and we do not know its exact content, Perry=s own
characterizations of the statement and the context in which it was made place
it firmly within the scope of his employment responsibilities.  For example, in
his petition, Perry repeatedly states that he was Aretaliated against
for performing [his] job.@  See, e.g., Pl.=s Seventh Am.
Pet., & 17 (ABecause [Perry]
sought to properly perform his job, including making relevant and material
communication with appropriate officials, [Perry] was the target of retaliation
by [appellants].@).  Activities undertaken in the course of
performing one=s job, even if unauthorized, are conducted pursuant to
official duties.  Nixon, 511 F. 3d at 497B99 (citing Williams,
480 F. 3d at 693).

We further note that CLEO can be accessed only by law
enforcement personnel who have been given passwords, and Perry could not obtain
a password without a superior=s authorization.  He previously sought and
was denied permission to obtain a password to access CLEO directly.  Moreover,
the summary-judgment evidence includes Perry=s testimony that
the speech at issue was related to his position as a gang officer performing an
investigation as provided in his job description:

If you look at my job description for the gang officer, it specifically
says that I am to deal with other agencies.  So, did I have prior - - I already
had prior permission to - - to deal with other agencies.  It was part of my
job.  It was part of what I did.

. . .

The event [i.e., the gang violence expected in May 2005] was something
I had heard about.  I was in the investigation stage.  If you read the content
of what I sent out, it simply was asking for information.

. . .








Again, my job description and - -
and what I understand my - - my job to be and what the policy says is that I -
- if I had evidence of a specific incident then I need to make that appropriate
- - to make that known.  I was gathering that inform - - all I had was - - was
minor information at this time when I sent that out, and I was looking for more
confirmation.  So, do I - - did I feel it was necessary [to obtain permission
before releasing the information]?  No, I was doing what I was supposed to be
doing in that I was trying to gather information to see how valid what I had
heard from another source and what I had been hearing in the district was.

According
to his own testimony, Perry was investigating gang activity and requesting
confirmation of information he learned in his investigation.  Although a job
description alone is not dispositive of the scope of an employee=s duties, Perry=s understanding of
his job responsibilities is supported by AISD policies included in the
summary-judgment record.[14]


Because private citizens do not have a right to post
gang-related information to CLEO, there is Ano relevant
analogue to speech by citizens who are not government employees.@  Garcetti,
547 U.S. at 424, 126 S. Ct. at 1961.  This assessment is unchanged by the fact
that Perry released information to another governmental employee for posting to
the site, thereby accomplishing indirectly what he had been denied permission
to do directly.  Appellants produced evidence that Perry=s conduct was
insubordinate in that it circumvented their decision to refuse authorization
for him to access CLEO directly.  In addition, they produced uncontroverted
evidence that Perry=s conduct generated ill‑will and
threatened to disrupt the school district=s normal
functioning on the days identified by Perry as posing an increased risk for
gang violence. 








In his response to the motion for summary judgment, Perry
stated that he released information for posting on the CLEO website Aas a concerned
citizen who is concerned not only about the public welfare, but also as a
citizen concerned about the safety of other law enforcement personnel.@[15]  This statement
is insufficient to bring the communication at issueCi.e., statements
by a gang officer to other law enforcement personnel regarding his
investigation of gang-related activityCwithin the
protection of the First Amendment.  See Davis v. Ector County, Tex., 40
F.3d 777, 782 (5th Cir. 1994) (A[A] proper inquiry does not elevate motive
to a determinative factor; instead, we are to examine the form, content, and
context of the statement.@).  Given the forum in which the speech
occurred, Perry=s inability to access the website directly
without his supervisor=s authorization, the particularized roles
of the speaker and the audience, and the content of the speech as described by
Perry, we conclude that his disclosure of information for posting to the CLEO
website was performed pursuant to his responsibilities as a gang officer, and
as such, is not protected.  We therefore agree with appellants= contention that
this speech was not protected by the First Amendment, and we sustain their
first issue as it pertains to this communication.

b.       Reporting Appellants= Allegedly
Unlawful Conduct to the Harris County District Attorney

In the remainder of their first issue, appellants contend
the trial court erred in denying them qualified immunity from Perry=s claims arising
from his report to the Harris County District Attorney that appellants
unlawfully removed a citation from Perry=s citation book. 
Again, Garcetti dictates that we begin our analysis by determining if
Perry engaged in the speech at issue pursuant to his employment
responsibilities.








Because Perry is a police officer and his speech consisted
of reporting his suspicions of unlawful activity, appellants contend that Perry
engaged in this speech pursuant to his employment.  In support of this
argument, appellants emphasize that they were accused of unlawfully removing a
citation.  They contend that Perry Aonly had the
authority to write tickets because he was a police officer; his reporting of
the removal of a ticket, therefore, is necessarily related to [his] employment
as a police officer.@  

This argument is without merit.  The speech at issue
consists of Perry=s report to the district attorneys= office alleging
that appellants unlawfully tampered with an existing  government record; the
identity of the person who created the record is irrelevant.  

Appellants also contend that this speech is unprotected
pursuant to Garcetti because Perry communicated his allegations to the
district attorney=s office while at work and in the course
of performing his duties.  Perry, however, testified without contradiction that
he communicated with the district attorney=s office via cell
phone, and did not recall using the office telephone for that purpose.  Because
appellants= argument relies on facts that are not established in
the record, it cannot support reversal.  See Scott, 550 U.S. at B, 127 S. Ct. at
1775B76; Tex. R. Civ. P. 166a(c); Green v.
Alford, No. 14-05-00407-CV,  BS.W.3dB, B, 2008 WL 2744232,
at *9 (Tex. App.CHouston [14th Dist.] July 15, 2008, no
pet. h.) (op. on en banc reh=g) (noting that an appellate court will
reverse the trial court=s denial of a qualified-immunity
summary-judgment motion Aonly if the evidence conclusively proves
facts establishing his entitlement to official immunity as a matter of law@).








Having concluded that Perry was not acting pursuant to his
employment responsibilities when reporting his suspicions of misconduct to the
district attorney=s office, we proceed to the Pickering/Connick
test and determine whether the speech addressed a matter of public
interest.  Some issues are inherently subjects of public concern.  Connick,
461 U.S. at 148, 103 S. Ct. at 1691 n.8 (racial discrimination) (citing Givhan
v. W. Line Consol. Sch. Dist., 439 U.S. 410, 415B16, 99 S. Ct. 693,
696B97, 58 L. Ed. 2d
619 (1979)).  The report of unlawful conduct by police officers is one such
issue.  Id. at 148, 103 S. Ct. at 1690B91 (communications
to inform the public that the employer Awas not
discharging its governmental responsibilities in the investigation and
prosecution of criminal cases@ is a matter of public concern); id.
(public has an interest in speech intended Ato bring to light
actual or potential wrongdoing or breach of public trust@ on the part of
public employees); Brawner v. City of Richardson, Tex., 855 F.2d 187,
191B92 (5th Cir. 1988)
(AThe disclosure of
misbehavior by public officials is a matter of public interest and therefore
deserves constitutional protection, especially when it concerns the
operation of a police department.@) (emphasis added,
footnote omitted).  We therefore conclude, as a matter of law, that the speech
at issue addressed a matter of public concern. 

Finally, we must balance (a) the interests of Perry
and the general public in allowing Perry to participate in speech on this
issue, and (b) AISD police department=s legitimate
purpose in Apromot[ing] efficiency and integrity in the discharge
of official duties,@[16] and maintaining A>proper discipline
in the public service.=@[17]  AThis involves
whether the speech: (1) was likely to generate controversy and disruption, (2)
impeded the department=s general performance and operation, and
(3) affected working relationships necessary to the department=s proper
functioning.@  Brawner, 855 F.2d at 192.  Significantly,
however, the absence of protection for the kind of speech at issue here would
undermine rather than promote efficiency and integrity. A[I]f the
allegations of internal misconduct are indeed true, [Perry=s] statements
could not have adversely affected the proper functioning of the department
since the statements were made for the very reason that the department was not
functioning properly due to corruption.@  Id.  On
this record, the public=s interest in Perry=s speech outweighs
the legitimate interests of his governmental employer; thus, application of the
Pickering/Connick test leads us to conclude that Perry=s speech to the
district attorney=s office was protected by the First
Amendment.  








Appellants contend that they nevertheless are entitled to
qualified immunity because they did not violate a clearly established right
protecting Perry=s speech.  To be considered clearly
established, Athe contours of the right must be sufficiently clear
that a reasonable official would understand that what he is doing violates that
right.@  Anderson,
483 U.S. at 640, 107 S. Ct. at 3039.  According to appellants, A[t]he act in
question in this case, disciplining a subordinate employee for violating a
policy or procedure, does not constitute a clearly established violation of
[Perry=s] constitutional
rights.@  

At the time of these events, however, it was
well-established that a legitimate report of unlawful police conduct is
protected by the First Amendment.  See, e.g., Davis v. Ector County,
Tex., 40 F.3d 777, 782 (5th  Cir. 1994); Brawner, 855 F.2d at 192; Lott
v. Andrews Ctr., 259 F. Supp. 2d 564, 568 (E.D. Tex. 2003) (filing a
legitimate criminal complaint with law enforcement officials constitutes an
exercise of the First Amendment right); see also Wal-Mart Stores, Inc. v.
Rodriguez, 92 S.W.3d 502, 507 (Tex. 2002) (AA citizen has a
clear legal right to report criminal misconduct to authorities . . . .@); Tex. Dep=t of Transp. v.
Needham, 82 S.W.3d 314, 320B21 (Tex. 2002) (clarifying that a report
of an alleged violation of law may be in good faith even though incorrect, if a
reasonable person with the employee=s level of
training and experience would also have believed that a violation had
occurred).  The only policy identified by appellants which such speech could
have violated was the policy communicated to Perry by Turner on September 29,
2005:  AYou are notified
by receipt of this memorandum that you are required to contact an AISD Police
Supervisor prior to contacting any [assistant district attorney] for charges.@[18]  








Such a policy cannot be applied lawfully to authorize
adverse employment action against a public employee Awho in good faith
reports a violation of law by the employing governmental entity or another
public employee to an appropriate law enforcement authority.@  See Tex. Gov=t Code Ann. ' 554.002(a)
(Vernon 2004).[19]  
To the contrary, section 554.002 is intended to (1) enhance openness in
government by protecting public employees who inform proper authorities of
legal violations, and (2) secure governmental compliance with the law on the
part of those who direct and conduct governmental affairs.  Town of Flower
Mound v. Teague, 111 S.W.3d 742, 752 (Tex. App.CFort Worth 2003,
pet. denied) (op. on reh=g) (citing Upton County v. Brown,
960 S.W.2d 808, 817 (Tex. App.CEl Paso 1997, no pet.) and Tarrant
County v. Bivins, 936 S.W.2d 419, 421 (Tex. App.CFort Worth 1996,
no writ)).  Law enforcement officers are not exempted from the statute=s protections.  See
Tex. Gov=t Code Ann. ' 554.002; Harris
County Precinct Four Constable Dep=t v. Grabowski, 922 S.W.2d 954,
955B56 (Tex. 1996)
(per curiam); Teague, 111 S.W.3d at 752B754; see also
United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass=n, 389 U.S. 217,
222, 88 S. Ct. 353, 356,19 L. Ed. 2d 426 (1967) (AThe First
Amendment would, however, be a hollow promise if it left government free to
destroy or erode its guarantees by indirect
restraints . . . .@).  Moreover, AISD
expressly incorporated the Awhistleblower protection@ of section
554.002 among the employee rights and privileges enumerated in its printed
policies.  

Because Turner and Bonaparte failed to demonstrate their
entitlement to official immunity for Perry=s claims arising
from his report of appellants= suspected misconduct, we overrule the
remainder of appellants= first issue as it pertains to this
speech. 

2.       Claims Arising
from Alleged Violations of Fourteenth Amendment Rights








Appellants next challenge the trial court=s failure to grant
summary judgment against Perry on his claim that appellants took adverse
employment action against him in violation of his Fourteenth Amendment right to
due process.  We begin our analysis by determining whether Perry was deprived
of a protected interest, and, if so, what process was his due.  See Logan v.
Zimmerman Brush Co., 455 U.S. 422, 428, 102 S. Ct. 1148, 1154, 71  L. Ed.
2d 265 (1982); Univ. of Tex. Med. Sch. at Houston v. Than, 901 S.W.2d
926, 929 (Tex. 1995).  

A property interest protected by procedural due process
arises where an individual has a legitimate claim of entitlement that is
created, supported, or secured by rules or mutually explicit understandings.  Alford
v. City of Dallas, 738 S.W.2d 312, 316 (Tex. App.CDallas 1987, no
writ).  Property interests also can be created by state law.  Town of Castle
Rock, Colo. v. Gonzales, 545 U.S. 748, 756, 125 S. Ct. 2796, 2803, 162 L.
Ed. 2d 658 (2005).  In their motion for traditional summary judgment regarding
Perry=s Fourteenth
Amendment claim for violation of his due process rights, Turner and Bonaparte
asserted that Perry was an at-will employee with no property interest in
continued employment.  Perry responded that he had a protected property
interest in continued employment pursuant to Texas Government Code sections
614.021B.023, which were
expressly adopted in AISD=s policy manual and which Turner and
Bonaparte had previously applied to Perry.  See Tex. Gov=t Code Ann. '' 614.021B.023 (Vernon 2004
and Supp. 2008).    

Section 614.022 of the Texas Government Code, entitled AComplaint to be in
Writing and Signed by Complainant,@ provides, ATo be considered
by the head of a state agency or by the head of a fire department or local law
enforcement agency, the complaint must be: (1) in writing; and (2) signed
by the person making the complaint.@  Id. ' 614.022. 
Section 614.023, entitled ACopy of Complaint to be Given to Officer
or Employee,@ further provides:

(a)     A copy of a signed complaint against a law
enforcement officer of this state . . . or peace officer
appointed or employed by a political subdivision of this state shall be given
to the officer or employee within a reasonable time after the complaint is
filed.

(b)     Disciplinary action may not be taken against
the officer or employee unless a copy of the signed complaint is given to the
officer or employee.

(c)     In addition to the requirement of Subsection
(b), the officer or employee may not be indefinitely suspended or terminated
from employment based on the subject matter of the complaint unless:








(1)     the complaint is investigated; and

(2)     there is
evidence to prove the allegation of misconduct.

Id. ' 614.023.[20] 
We previously construed these statutes and concluded that the complaint must be
in writing and signed by the person who claims to be the victim of misconduct. 
Guthery v. Taylor, 112 S.W.3d 715, 721B23 (Tex. App.CHouston [14th
Dist.] 2003, no pet.).  Here, state law and AISD policy[21]
created a property interest: in the absence of complaints that were signed,
delivered, investigated, and supported by evidence, Perry had a legitimate
expectation of continued employment secured by sections 614.021B023 of the Texas
Government Code.

Having determined that Perry had a protected property
interest, we must now identify the process required to protect that interest. 
Generally, due process is measured by a flexible standard that depends on the
practical requirements of the circumstances.  Mathews v. Eldridge, 424
U.S. 319, 334, 96 S. Ct. 893, 902, 47 L. Ed. 2d 18 (1976).  This standard
includes three factors: (1) the private interest that will be affected by
the official action; (2) the risk of an erroneous deprivation of such
interest through the procedures used, and the probable value, if any, of
additional or substitute procedural safeguards; and (3) the government=s interest,
including the function involved and the fiscal and administrative burdens that
the additional or substitute procedural requirement would entail.  Id. at
335, 96 S. Ct. at 903.  








According to appellants, the grievance process provided
Perry with any due process to which he was entitled.  We cannot agree that this
substitute procedure protected Perry=s due process
rights.  By enacting sections 614.021B023, of the
Government Code, the State provided covered employees with procedural
safeguards to reduce the risk that adverse employment actions would be based on
unsubstantiated complaints.  Moreover, the State determined that the value of
these protections outweighs the fiscal and administrative burdens incurred by
complying with statutory requirements.  In contrast, the summary- judgment
evidence demonstrates that the procedures appellants followed impaired Perry=s ability to
investigate or defend against the complaints made against him.

Rather than requiring complaints of alleged misconduct to
be signed by the victim, appellants accepted and acted upon complaints that did
not identify the true complainant.  Instead, these complaints expressed the
conclusions of other peace officers based on general allegations of
unidentified people.  For example, Officer Wayne Cox wrote, 

In speaking with fellow officers,
who wish to remain anonymous, I feel that Officer Troy Perry is threatening to
undermine your authority as chief and erode the good order and discipline of
the department.  I respectfully request that he not be allow[ed] to interact
with students at the Elsik campus as he tends to incite or inflame already
volatile situations by his demeanor. . . . I opine that
Officer Perry should never have any contact with the public as he is the
antithesis of a professional police officer.

Cox=s partner, Officer
William Britton, similarly wrote, 

It has been brought to my attention
by my fellow officers that Officer Perry has been speaking ill of the
department.  I have been with Officer Perry on several occassions [sic] at
Elsik and I feel that his actions with the students at Elsik are not that of a
professional police officer.  I have observed him shout, yell and degrade
students with whom he was interacting.

Officer
Karen Meier emailed Bonaparte that the Amorale in the
department and overall tension level among officers is very strained@ and Amost of this could
be avoided if Officer Perry could keep whatever problems he has with the
department and supervisors to himself and not drag everyone into it.@ 








Deposition testimony demonstrated further problems with the
procedure followed by appellants.  Benitez testified that one of her job
responsibilities requires her to investigate whether accusations are verifiable
and truthful.  Nevertheless, there was no investigation concerning Perry=s release of
information for posting on the CLEO website, and she does not know that any
AISD employee, other than law enforcement personnel, saw the posting.  She
further agreed that there is Anothing in writing, no dates, no names and
no way to investigate@ the allegations against Perry.  Benitez
conceded that she did not develop enough specific data to allow Perry to
investigate Aand give his side of the case,@ and stated her
opinion that Perry could be terminated Afor any reason or
no reason.@  Rather than investigating, Benitez relied on
statements concerning unidentified students, including statements from Turner
and Bonaparte.  Turner, however, testified that he does not remember any
specific incident in which he observed Perry behaving inappropriately with
students, and Bonaparte asserted his rights under the Fifth Amendment and
refused to answer questions concerning this suit.[22]   
     In sum, appellants= failure to follow statutory procedure
magnified the risk that adverse employment action would be taken based on
unsubstantiated complaints.  Cf. Tex.
Gov=t Code Ann. '' 614.022, 614.023[23]
(requiring complaints against police officers to be written, signed,
investigated, and supported by evidence if they are used as the basis for
adverse employment action).  On this record, we cannot conclude that the trial
court erred in denying appellants= motion for
summary judgment regarding Perry=s Fourteenth
Amendment claims.

 

 








B.      Official
Immunity

In their second issue, appellants argue that they are
entitled to official immunity from Perry=s claims of
slander,[24]
and thus, the trial court erred in failing to grant summary judgment on this
basis. Official immunity under common law is based on the need for public
servants Ato act in the public interest with confidence and
without the hesitation that could arise from having their judgment continually
questioned by extended litigation.@  Ballantyne v.
Champion Builders, Inc., 144 S.W.3d 417, 424 (Tex. 2004).  It is an
affirmative defense barring state law claims against a governmental employee=s performance
(1) of discretionary duties, (2) within the scope of the employee=s authority,
(3) provided that the employee acts in good faith.  Id. at 422; Univ.
of Houston v. Clark, 38 S.W.3d 578, 580B81 (Tex. 2000);
City of Lancaster v. Chambers, 883 S.W.2d 650, 653 (Tex. 1994).  The
doctrine is based on the theory that the threat of liability will make public
officials unduly timid in carrying out their official duties, and effective
government will be promoted if officials are freed of the costs of vexatious
and frivolous litigation.  Westfall v. Erwin, 484 U.S. 292, 295, 108 S.
Ct. 580, 583, 98 L. Ed. 2d 619 (1988), superseded by statute on other
grounds, 28 U.S.C. '' 2671B2679 (1989 Supp.),
as recognized in United States v. Smith, 499 U.S. 160, 111 S. Ct. 1180, 113
L. Ed. 2d 134 (1991).  Thus, immunity from state-law claims is intended to
insulate essential governmental functions from the harassment of litigation and
remove the deterrent to public service posed by the threat of heavy personal
liability for errors in judgment.  See Ballantyne, 144 S.W.3d at 424; Kassen
v. Hatley, 887 S.W.2d 4, 8 (Tex. 1994).








On appeal, the parties have focused their arguments on the
element of good faith. To determine whether a public official has acted in good
faith, we look to the objective standard adopted in Chambers. 883 S.W.2d
at 656.  The summary-judgment movant must produce evidence that a reasonably
prudent official, under the same or similar circumstances, could have believed
that his conduct was justified based on the information he possessed when the
conduct occurred.  Wadewitz v. Montgomery, 951 S.W.2d 464, 467 (Tex.
1997).

Appellants, however, failed to produce evidence that a
reasonable officer in the same or similar circumstances could have believed
that statements such as those made by Turner and Bonaparte were justified.  In
their affidavits in support of summary judgment, both Turner and Bonaparte
stated:

It is within my job duties to report
to . . . administration, and specifically the Human
Resources Department, what I believe, using my discretion, to be relevant in
determining a subordinate=s employment or disciplinary
future.

This was the case when reporting to the administration regarding Troy
Perry and his job performance.  I made the determination, using my discretion
and judgment, as to what would be relevant to the administration in making a
decision as to Troy Perry=s employment with Alief or any
disciplinary measure taken.  I performed these discretionary duties believing
that my reporting to the administration as to Troy Perry was in the best
interest of the District and believing what I reported to be true.

I received reports from various administrators within the District that
Troy Perry=s behavior, with respect to his
interactions with students, parents, and faculty, was inappropriate.  I used my
judgment and found these reports to be reliable and in the interest of Alief
and its students and faculty, I reported my findings as well as my observations
to . . . Human Resources.  This was done without
malice. . . . 

It is not my understanding that my
issuance of disciplinary measures, such as my issuance of a verbal or written
directive; the assignment of a growth plan; or even recommendation of
termination, for violation of District or department policy or procedures, in
any way violates the Constitutional rights of any officers under my
supervision.

In
effect, each appellant states that he felt justified in making the statements
and reports at issue regarding Perry=s conduct;
however, in analyzing claims of official immunity, Aconsideration of subjective
evidence of the good faith element of official immunity is inappropriate.@ Ballantyne,
144 S.W.3d at 419 (emphasis added).  








Because Turner and Bonaparte failed to produce evidence
that a reasonably prudent officer, in the same or similar circumstances, could
have believed that their representations of Perry=s conduct were
justified, the trial court properly denied summary judgment on this ground.  
We therefore overrule appellants= second issue.

V.  Conclusion

We conclude that Perry did not engage in protected speech
when he released information for publication to a law-enforcement website. 
Consequently, appellants are entitled to qualified immunity against Perry=s claims that they
violated his First Amendment rights in connection with this communication.  We
therefore reverse the trial court=s order and render
judgment that appellants are immune from liability arising from adverse
employment actions taken in response to Perry=s release of
information for publication to the CLEO website.  In all other respects, we
affirm the trial court=s order denying summary judgment, and we
remand the case for further proceedings consistent with this opinion.

  

 

 

/s/      Eva M. Guzman

Justice

 

 

Panel consists of
Chief Justice Hedges and Justices Guzman and Brown.









[1]  Perry attributes the delay in entering the charges
into the computer system to school closures in connection with Hurricane Rita.





[2]  Perry filed another grievance on November 28, 2005, and an unsuccessful
grievance hearing was held on January 19, 2006.





[3]  On appeal, the parties do not address Perry=s claim for intentional infliction of emotional
distress or appellants= contention that Perry failed to exhaust
administrative remedies.





[4]  The plurality opinion may be taken to state the
holding of the Court.  As J. Souter explained in a concurring opinion, a
majority of the Court agreed that, in the absence of pretext, employers whose
conduct survives the plurality=s
reasonableness test cannot be held constitutionally liable.   Waters, 
511 U.S. at 685B86, 114 S. Ct. at 1893 (Souter, J., concurring).  A
different majority agreed that employers whose conduct fails the plurality=s reasonableness test have violated the Free Speech
Clause.  Id.





[5]  Id. at 148, 103 S. Ct. at 1690.





[6]  Id. at 148, 103 S. Ct. at 1691.





[7]  Id. at 152B53,
103 S. Ct. at 1693.





[8]  Id. at 151, 103 S. Ct. at 1692.





[9]  Id. at 148, 103 S. Ct. at 1690B91. 





[10]  Id. 





[11]  Although the events in this case predate Garcetti,
we apply its threshold requirement when determining whether Perry engaged in
protected speech.   See Harper v. Va. Dep=t of Taxation,
509 U.S. 86, 97, 113 S. Ct. 2510, 2517, 125 L. Ed. 2d 74 (1993) (explaining
that the Supreme Court=s announcement of a rule of federal law applies to all
open cases and events, regardless of whether such events predate or postdate
the Court=s announcement of the rule).  We do not, however,
consider Garcetti as part of the law that was Aclearly established@ at
the time appellants are alleged to have violated Perry=s constitutional rights.  See Hope, 536 U.S. at 741, 122 S. Ct. at 2516 (describing the test for
ascertaining the Aclearly established@
law at the time of the alleged violations).





[12]  That the employee=s
speech concerns facts learned while working is not dispositive.  See 
Charles v. Grief, 522 F.3d 508, 513B14
(5th Cir. 2008) (Texas Lottery Commission employee=s allegations of Commission misconduct, made to
members of the Texas legislature with oversight over the Commission, is
protected even though the speech concerned facts learned at work).





[13]  In City of San Diego, the Supreme Court held
that the police department had a legitimate and substantial interest in
preventing one of its officers from selling pornographic videos of himself on
eBay where the officer identified himself as a law enforcement officer, appeared
in uniform, and performed indecent acts.  Nixon, 511 F.3d at 500B01 (citing City of San Diego, 543 U.S. at 81).





[14]  For example, a policy entitled AAlief ISD Policy CKE (Legal)@ states that a Apeace
officer may provide assistance to another law enforcement agency . . . .@





[15]  In Perry=s
Seventh Amended Petition, however, he alleged that he Awas reprimanded even though the AISD Gang Officer=s stated responsibilities included protecting AISD
students and personnel, and the responsibility to work with other agencies to
track, monitor and document criminal gang sets, affiliates and associates.@





[16]  Arnett v. Kennedy, 416 U.S. 134, 168, 94 S.
Ct. 1633, 1651, 40 L. Ed. 2d 15 (1974) (Powell, J., concurring).





[17]  Connick, 461 U.S. at 150B51, 103 S. Ct. at 1692 (quoting Ex parte Curtis,
106 U.S. 371, 1 S. Ct. 381, 384, 27 L. Ed. 232 (1882)).





[18]  During his deposition, Turner testified that it was
part of AISD police department=s Aprocedure@ to
obtain prior approval from a supervisor before disseminating Ajuvenile information and information that could cause
alarm.@  Turner denied that this was a Apolicy.@  





[19]  An appropriate law enforcement authority includes
governmental entities that the employee in good faith believes are authorized
to investigate or prosecute a violation of criminal law.  Id. ' 554.002(b)(2).





[20]  Act of May 16, 1969, 61st Leg., R.S., ch. 407, ' 1, 1969 Tex. Gen. Laws 1333, 1333B34 (formerly codified as Vernon=s Ann. Civ. St. art. 6252-20, eff. June 2, 1969), recodified
by Act of May 4, 1993, 73rd Leg., R.S., ch. 268, ' 1, 1993 Tex. Gen. Laws 583, 678B79, amended by Act of  May 19, 2005, 79th Leg.,
R.S., ch. 507, ' 1, 2005 Tex. Gen. Laws 1394, 1394, eff. Sept. 1,
2005.





[21]  See County of Dallas v. Wiland, 216 S.W.3d
344, 348 (Tex. 2007) (stating that at-will employment of public employees may
be modified by agreement with the employer, as in a personnel manual).  Here,
the AISD police force expressly adopted the state statutes as its own policy. 





[22]  Cf. Fudge v. Haggar, 621 S.W.2d 196, 197B98 (Tex. App.CTexarkana
1981, writ ref=d n.r.e.) (holding that a written,signed complaint by
an internal investigator concerning police officer=s improper release of prisoner, supported by
affidavits from Apretrial release employees,@ fulfilled statutory requirements because Athe entire investigation began within the police
department@).





[23]  To the contrary, Benitez testified that she did not
investigate the complaints.





[24]  Perry=s
slander claim is primarily based on appellants= representations that he engaged in Ainappropriate
interactions with students.@